UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Stephanie Badolato,<br>    *Plaintiff*, | Civil No. 3:10cv1855 (JBA) |
| *v.* | |
| Joseph Adiletta, Rebecca Garcia, and Joseph<br>Badolato,<br>    *Defendants*. | July 24, 2012 |

RULING ON MOTION FOR SUMMARY JUDGMENT

On November 29, 2010, Plaintiff Stephanie Badolato filed a Complaint against Defendants Joseph Adiletta, Rebecca Garcia, and Joseph Badolato, claiming that Defendants deprived her of her rights to family association and to be free from a deprivation of substantive due process of law in violation of the First, Fourth, Ninth, and Fourteenth Amendments, deprived her of her rights of equal protection of the laws and access to the courts in violation of the First and Fourteenth Amendments, and are liable for intentional infliction of emotional distress ("IIED"). Defendants move [Doc. # 33] for summary judgment on all of Plaintiff's claims. For the reasons stated below, Defendants' motion for summary judgment will be granted.

I.      Relevant Undisputed Facts

Defendants Joseph Badolato, Rebecca Garcia, and Joseph Adiletta are employed as officers with the Bridgeport Police Department; Lieutenant Garcia and Sergeant Adiletta work in the Office of Internal Affairs ("OIA"). Plaintiff Stephanie Badolato and Defendant Joseph Badolato married January 31, 1998 (Separation Agreement, Ex. D to Defs.' Loc. R. 56(a)1 Stmt [Doc. # 33-2] at 1), but separated on December 15, 2007 (Pl.'s Dep., Ex. B to Defs.' 56(a)1 Stmt at 19:22–20:5) and divorced July 23, 2009 (*Badolato v. Badolato* Docket,

FBT–FA08–4023666–S, Ex. E to Defs.' 56(a)1 Stmt).  On January 13, 2009, Stephanie and Joseph Badolato entered into a Separation Agreement, which provided that Joseph would retain possession of their home and that they would have joint legal custody of their six children, whose primary residence would be with Joseph.  (Separation Agreement, Ex. D to Defs.' 56(a)1 Stmt at 4, 8.)  They signed an Amendment to the Separation Agreement on June 3, 2010 that provided that Stephanie would no longer be allowed to visit with their children in Joseph's home.  (Amendment, Ex. F to Defs.' 56(a)1 Stmt at 1–2.)

Ms. Badolato testified during her deposition that in July 2008 she went to OIA at the Bridgeport Police Department to have OIA investigate Joseph Badolato's treatment of her, including alleged threats, rape, and a false police report that he filed against a Captain McCarthy in the Bridgeport Police Department.  (Pl.'s Dep. at 41:15–42:10.)  She spoke with Sergeant Adiletta and Lieutenant Garcia and testified that the officers "seemed to listen" to her concerns.  (*Id.* at 43:25–45:24.)  According to Ms. Badolato, she told Sergeant Adiletta and Lieutenant Garcia that in June 2007 Mr. Badolato engaged in non–consensual anal intercourse with her by holding her down after she told him "No," but that she had not previously reported the incident because she was afraid of him.  (*Id.* at 45:20–50:2.)  She testified that after the sexual assault, she said to Mr. Badolato "I have to call someone," to which he responded "Don't do it" while he was holding his police belt, with his gun in it, in his hands.  (*Id.* at 54:15–55:10.)  Ms. Badolato perceived this as a threat.  (*Id.* at 55:11–21.)  She also testified that she told the OIA officers that Mr. Badolato had hit her and thrown her into a wall when she was seven months pregnant with their third daughter.  (*Id.* at 50:3–12.)

Ms. Badolato also claims that she told Sergeant Adiletta and Lieutenant Garcia that Joseph Badolato had previously filed a false complaint against Captain McCarthy in which

Mr. Badolato claimed that Captain McCarthy had assaulted him.  (*Id.* at 50:19–54:14.)  She testified that her ex–husband had told her that in his complaint he accused Captain McCarthy of physically assaulting him, and that she was present at the incident that gave rise to the complaint and knew that there was no physical assault.  (*Id.*)

Ms. Badolato testified that after she described these incidents to Adiletta and Garcia, they told her "that there were no witnesses.  That it was my word against his.  And also that if I were to pursue this, that it would probably go nowhere."  (*Id.* at 56:19–24.)  She also stated that they told her that pursuing any claims against Mr. Badolato would cost her a lot of money, and that it "would be a long, drawn–out thing."  (*Id.* at 56:25–57:19.)  Sergeant Adiletta and Lieutenant Garcia called in Captain James Baraja, but Ms. Badolato testified that he just stood in the doorway, and "didn't take so much as a pencil out," but told her "if I wanted to pursue it, that it would be my word against his, and that it would be a very difficult case to prove."  (*Id.* at 57:20–60:11.)  She testified that she then left OIA "[b]ecause I didn't feel anybody would help me"; she added that she did speak to her attorney while she was at OIA and that her attorney told her "We will deal with this."  (*Id.* at 63:9–23.)

In a transcribed statement that Ms. Badolato gave to Sergeant Adiletta and Lieutenant Garcia on December 8, 2008, however, she stated that she felt they attempted to help her during the July 2008 meeting, but that they also told her "how difficult it would be because there were no police reports."  (OIA Report, Ex. G to Defs.' 56(a)1 Stmt at 33.)  She further stated that she did not follow through on her July 2008 complaints because the officers advised her to speak to her attorney, which she did, and her attorney "had said to wait until [the] divorce proceeding was over because that was a whole other issue to focus on."  (*Id.* at 34.)

Ms. Badolato also claims that in the days after she visited OIA, Mr. Badolato threatened her friends, telling her "If I ever see Phil Mascendaro or James Lancia again, I will shoot them on sight." (Pl.'s Dep. at 73:6–19.) She testified that she spoke with Sergeant Adiletta on the phone after she returned to Florida on August 4th or 5th and told him about the death threat, and that Sergeant Adiletta said he would look into it. (*Id.* at 77:14–78:7.) Ms. Badolato further testified that she called OIA again in October to ask "what was going on with that death threat," and that Sergeant Adiletta denied having spoken with her about the death threat in August. (*Id.* at 80:3–81:14.) Lieutenant Garcia and Sergeant Adiletta confirmed in memoranda written to the OIA file that Sergeant Adiletta denied having ever spoken with Ms. Badolato in August 2008 about threats made by Mr. Badolato. (OIA Report at 11, 15.) Sergeant Adiletta also wrote in a memorandum to Chief Gaudett that both Lancia and Mascendaro stated that they did not feel threatened by Joseph Badolato, and that they declined to cooperate with the investigation. (*Id.* at 16.)

Ms. Badolato testified that she went to OIA in November 2008 and that Sergeant Adiletta and Lieutenant Garcia informed her they would only talk to her about her "death threat" complaint and not her other complaints because Chief Gaudett told them they "have to investigate this death threat." (Pl.'s Dep. at 88:5–89:13.) Ms. Badolato gave the officers a recorded statement, but did not feel that they did an adequate job taking the statement because, according to Ms. Badolato, they asked "irrelevant" and "intimidating" questions and Lieutenant Garcia made a "laughing noise" when Ms. Badolato claimed that she had reported the threat to Sergeant Adiletta in August. (*Id.* at 89:14–91:2.) She was informed by letter that she would have to come back to OIA to sign the transcript of her recorded statement, but testified that she did not know that if she did not sign the transcript, her

complaint would be dismissed. (*Id.* at 93:19–94:4.) The OIA investigation into her complaint of Mr. Badolato's threats against Lancia and Massendero was closed on March 5, 2010 because "[b]oth intended victims refused to cooperate with [the] investigation" and because Ms. Badolato "refused to return to [OIA] to [notarize] her statement." (OIA Report at 4.)

Ms. Badolato also testified during her deposition that in February 2010, she was visiting her children in her and Mr. Badolato's former "marital home" and was scheduled to stay with them for a week from Sunday to Saturday. (Pl.'s Dep. at 112:10–19.) She alleged that Mr. Badolato came to the house "a couple of times" during the week and told her that she would have to leave on Friday, rather than Saturday, and that if she didn't she "would be arrested and the police were already in place." (*Id.* at 112:25–113:19.) She further testified that Mr. Badolato "changed his mind" and that she stayed until Saturday. (*Id.* at 114:24–115:6.) Ms. Badolato also alleged that in August 2010 she was scheduled to visit her children during the day for a few days, but not overnight, and that Mr. Badolato called her and said "If you step foot on my property or my family's property, you will be arrested." (*Id.* at 115:7–117:6, 119:24–120:8.) She "did not recall" whether she actually visited her children on the scheduled days after Mr. Badolato's threats. (*Id.* at 120:25–121:16.)

II.    Discussion[1]

    A.    Substantive Due Process

Defendants argue that they are entitled to summary judgment on Plaintiff's substantive due process claims because neither Ms. Badolato's allegations nor the undisputed material facts demonstrate that any of the Defendants engaged in behavior that is conscience–shocking, that Defendants Garcia or Adiletta denied her access to the courts, or that Defendant Badolato deprived her of her right to family association. Plaintiff argues that the evidence supports her claim that Defendants Adiletta and Garcia infringed her right of access to the courts and her claim that Defendant Badolato infringed her right of family association, and that Adiletta's and Garcia's conduct "sanctioning or condoning sexual assault" and Mr. Badolato's using "the power of his badge to deprive a mother of court–ordered visitation rights with her six minor children" shock the conscience (Opp'n [Doc. # 34] at 10).

        *1.    Defendants Garcia and Adiletta*

An individual has a constitutional right of access to the courts, protecting him or her from actions that hinder a plaintiff's efforts to pursue a legal claim. *Monsky v. Moraghan*, 127 F.3d 243, 246–47 (2d Cir. 1997). This right extends only to a plaintiff's efforts to bring

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

a civil claim, however, as "a private citizen does not have a constitutional right to bring a criminal complaint against another individual." *Price v. Hasly*, 04–CV–0090S(SR), 2004 WL 1305744, *2 (W.D.N.Y. June 8, 2004) (citing *Leeke v. Timmerman*, 454 U.S. 83 (1981); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973); *Ostrowski v. Mehltretter*, 20 F. App'x 87 (2d Cir. 2001)) (dismissing plaintiff's claims that corrections officer and prison administrator failed to pursue criminal charges against a fellow inmate who assaulted him because he had no constitutional right to have those charges brought); *see also Linda R.S.*, 410 U.S. at 619 ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *Pigott v. Lynn Police Dep't*, 7 F.3d 218, 1993 WL 375821, *7 (1st Cir. 1993) ("[T]he right of access to the courts does not import an absolute right to institute criminal proceedings. Insofar as Pigott contends that the Lynn Police Department violated this right simply by refusing to accept his criminal complaint, he has alleged the violation of a legal interest that does not exist.").

As Plaintiff argues in her opposition to Defendants' motion for summary judgment, her "access to the courts" claim arises from Garcia and Adiletta "persuading her not to pursue her criminal complaint against the defendant Badolato for sexual and physical assaults committed within the applicable five–year statute of limitations for felonies in Connecticut." (Opp'n at 6.) Her counsel reiterated at oral argument that this claim is related only to Ms. Badolato's desire to have a criminal complaint brought against Joseph Badolato; Ms. Badolato does not claim that Sergeant Adiletta or Lieutenant Garcia hindered her efforts to bring a civil action against her ex–husband.  Ms. Badolato's counsel further agreed at oral argument that there is no constitutional right of access to the courts for criminal matters. Without a constitutional right to bring a criminal complaint, Ms. Badolato

does not have a cognizable claim against Defendants Adiletta and Garcia for a violation of her right of access to the courts.

To the extent that Plaintiff claims that Adiletta's and Garcia's actions violated her substantive due process rights by sanctioning or condoning sexual assault, "[s]ubstantive due process protects against government action that is arbitrary, conscience–shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trustees*, 660 F.3d 612, 626 (2d Cir. 2011). Substantive due process will only apply where the alleged right at issue is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Local 342 v. Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) (quoting *Reno v. Flores*, 507 U.S. 292, 303 (1993)). Here, Adiletta and Garcia's failure to pursue a criminal complaint against Defendant Badolato was neither conscience–shocking nor oppressive in a constitutional sense, nor did it violate any right of Ms. Badolato to a criminal complaint that is rooted "in the traditions and conscience of our people." *See Fedor v. Kudrak*, 421 F. Supp. 2d 473, 483–84 (D. Conn. 2006) (Droney, J.) (defendant police officers' failure to investigate a husband's criminal complaint against his wife "could hardly be deemed such as to 'shock the conscience'").

Plaintiff argues in her Opposition that conduct "sanctioning or condoning sexual assault . . . typically will be found to violate substantive due process" (Opp'n at 10), however the cases she cites for this proposition are inapposite. *Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 454–55 (5th Cir. 1994) addressed liability of supervisory school officials for a subordinate's violation of a student's constitutional right to bodily integrity in a physical sexual abuse case. *Doe v. Claiborne Cnty.*, 103 F.3d 496, 508 (6th Cir. 1996) concerned municipal liability for a school teacher's violation of a student's constitutional right to bodily

integrity.  In *Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1076 (11th Cir. 2000), the Eleventh Circuit held that the plaintiff's claim that his high school football coach struck him in the face with a "weight lock," resulting in the "utter destruction" of his eye constituted corporal punishment of such an egregious nature that it would violate plaintiff's substantive due process rights.  None of the cases cited by Plaintiff support the proposition that a law enforcement officer's decision not to pursue a criminal complaint can constitute conscience–shocking conduct in the sense of a substantive due process violation, particularly in light of fact that Ms. Badolato has no cognizable constitutional right to bring a criminal complaint.

Defendants' motion for summary judgment as to the access to the courts and substantive due process claims against Adiletta and Garcia is therefore granted.

### 2.    *Defendant Badolato*

Plaintiff claims that Defendant Badolato violated her substantive due process right to family association by threatening to arrest her if she exercised visitation rights with her children.  "Family members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Anthony v. City of New York*, 339 F.3d 129, 142–43 (2d Cir. 2003) (internal quotation marks and citations omitted).  To succeed on a family association claim, a plaintiff must demonstrate that his or her separation from family members "was so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* at 143.

A temporary separation of a child from his or her parents does not ordinarily violate the parents' substantive due process rights.  *Tenenbaum v. Williams*, 193 F3d 581, 600–01

9

(2d Cir. 1999) ("The temporary separation of Sarah from her parents [to determine whether or not she was abused] did not result in the Tenenbaums' wholesale relinquishment of their right to raise Sarah. The interference was not severe enough to constitute a violation of their substantive due–process rights.").  Although the Second Circuit has not addressed the circumstances under which the infringement of a parent's visitation rights can constitute a substantive due process violation, several other circuits have held that "minor infringements" in visitation rights do not rise to the level of constitutional violations.  *See Brittain v. Hansen*, 451 F.3d 982, 993–96 (9th Cir. 2006) ("[W]e do not believe a single instance of visitation, of a single week in duration, is a 'fundamental' right. As such, substantive due process does not provide a remedy in this case."); *Zakrzewski v. Fox*, 87 F.3d 1011, 1014–15 (8th Cir. 1996) (defendants did not "intentionally infringe[] upon Zakrzewski's liberty interest in a manner that shocks the conscience" where "his visitation period was temporarily cut short on one occasion when law enforcement officials were confronted with a complaint that Zakrzewski had violated the visitation terms of the decree"); *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1982) ("[a]ny deprivation of Wise's visitation rights was so insubstantial in duration and effect to rise to a federal constitutional level" where his "extended visit" with his daughter was cut short when police officers took the girl and returned her to her mother).

Here, the right to family association that Plaintiff claims was violated by Defendant Badolato's arrest threats were her short–term visits with her children in February and August 2010.  Ms. Badolato's visit in February 2010 was not cut short (Pl.'s Dep. at 114:24–115:6), and she does not recall whether she cancelled her August 2010 visit due to his threats (*id.* at 120:25–121:16).  Even if the August 2010 visitation, scheduled for a "few

days," had been cut short or cancelled, under the holdings in *Brittain*, 451 F.3d at 993–96, *Zakrzewski*, 87 F.3d at 1014–15, and *Wise*, 666 F.2d 1333, such a short–term infringement on visitation rights does not shock the conscience in a constitutional sense such that it violates the guarantees of the substantive due process clause.

Defendant Joseph Badolato's motion for summary judgment on Ms. Badolato's family association substantive due process claim is therefore granted.

B.    Equal Protection

Defendants argue that they are entitled to summary judgment in their favor on Ms. Badolato's equal protection claim because there is no evidence in the record to support an inference that they treated her differently than other individuals similarly situated to her in all material respects.  Ms. Badolato argues that there is sufficient evidence to support a claim that "Adiletta and Garcia subjected the plaintiff to disparate treatment on the basis of her complaint being against a member of the police department rather than against a civilian" (Opp'n at 7), however her counsel conceded at oral argument that there is nothing in the evidentiary record that would show how any other individuals were treated by the Bridgeport Police Department.[2]  Instead, her counsel argued that this claim should survive summary judgment based on the "inference" that if Ms. Badolato lodged a complaint against a civilian, rather than a member of the Bridgeport Police Department, her complaint would have been pursued.

_____

[2] Although it is unclear from Plaintiff's Complaint whether she also claims that Defendants Adiletta and Garcia treated her differently on account of her gender, her counsel clarified at oral argument that she is not pursuing an equal protection claim on the basis of gender.

Plaintiff relies entirely on *Myers v. County of Orange*, 157 F.3d 66, 75–76 (2d Cir. 1998), in which the Second Circuit held that Orange County's first–come first–served policy under which the County District Attorney's office directed police not to entertain "any complaint by a person named as a wrongdoer in a prior related civilian complaint—until the initial complaint had been either dismissed or prosecuted" violated the Equal Protection Clause because it ran contrary to the objectives of law enforcement, created "an unnecessary risk that innocent persons will be prosecuted and possibly convicted," and served no legitimate government interest. *Myers* is readily distinguishable from this case, however, as *Myers* was essentially a selective prosecution case in which the plaintiff was subject to a criminal investigation and prosecution, whereas the individual against whom he complained was not. Importantly, Plaintiff has not alleged that there exists, nor is there any evidence in the record of, any Bridgeport Police Department policy of pursuing some complaints but not others. *See Cantave v. New York City Police Officers*, 09–CV–2226(CBA)(LB), 2011 WL 1239895, *5–6 (E.D.N.Y. Mar. 28, 2011) (distinguishing plaintiff's claim that officers arrested and prosecuted him while not arresting the individual against whom he complained from *Myers* on the ground that "plaintiff has made no showing that the defendants acted in accordance with a policy favoring a first-filed complaint or, indeed, any other policy that can be evaluated on the basis of its relationship to a legitimate governmental interest").

Because her equal protection claim does not allege membership in a protected class or group, Ms. Badolato must demonstrate that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom

they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds, Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). Such a plaintiff must show that: "(I) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id.*

As Ms. Badolato's counsel agreed at oral argument, there is no evidence in the record that Defendants treated Ms. Badolato any differently than individuals who brought complaints against civilians rather than police officers. The absence of such evidence is fatal to her claim. Defendants' motion for summary judgment on Plaintiff's equal protection claim is therefore granted.

C.      Intentional Infliction of Emotional Distress[3]

To prevail on her IIED claim against Joseph Badolato, Plaintiff has the burden of establishing four elements:

> (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis*, 200 Conn. 243, 253 (2006). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a

---

[3] Plaintiff's counsel clarified at oral argument that Ms. Badolato is only pursuing her IIED claim against Defendant Joseph Badolato.

nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 712 (2000).

Plaintiff claims that she suffered severe emotional distress as a result of Defendant Badolato's threats to arrest her in February and August, 2010.  (Compl. ¶ 8.)  Her counsel further asserted at oral argument that Ms. Badolato's IIED claim is based on each of the alleged acts committed by Joseph Badolato, including the arrest threats and the sexual assault.  With respect to Mr. Badolato's arrest threats, a police officer's verbal harassment and arrest threats do not rise to the level of extreme and outrageous conduct in the context of an IIED claim. *See Winter v. Northrop*, 3:06cv216(PCD), 2008 WL 410428, *7 (D. Conn. Feb. 12, 2008) (Woodbury Constable Howard Northrop's actions, "yell[ing] and scream[ing] at Plaintiff over the phone, threatening him with arrest," did not go beyond all possible bounds of decency).  With respect to the alleged sexual assault, Ms. Badolato claimed that her ex–husband engaged in non–consensual intercourse in June 2007 (Pl.'s Dep. at 45:20–50:2), more than three years prior to her filing the Complaint in this case, on November 29, 2010.  Pursuant to Conn. Gen. Stat. § 52-577, "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of," therefore her IIED claim based on Mr. Badolato's assault is time–barred.

Defendants' motion for summary judgment on Plaintiff's IIED claim is therefore granted.

14

III.    Conclusion

For the reasons stated above, Defendants' motion [Doc. # 33] for summary judgment is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of July, 2012.

15